## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Fred Fotouhi,**

       **Plaintiff,**

**v.**                                      **Case No. 15-2587-JWL**

**Mobile RF Solutions, Inc.;**
**Wireless Site Services, Inc.;**
**and Brian Troia,**

       **Defendants.**

### MEMORANDUM & ORDER

      Plaintiff Fred Fotouhi filed a state court petition against defendants for breach of contract and failure to pay wages after defendants terminated Mr. Fotouhi's employment as Chief Executive Officer of defendant Mobile RF Solutions, Inc.  Defendants timely removed the case to this court on the basis of diversity jurisdiction under 28 U.S.C. § 1332.  This matter is now before the court on defendant Brian Troia's motion to dismiss the single claim asserted against him (a claim for failure to pay wages under the Kansas Wage Payment Act (KWPA), K.S.A. § 44-313 et seq.) or, in the alternative, to transfer the case to a more convenient forum.  With respect to the motion to dismiss, Mr. Troia asserts that the court lacks personal jurisdiction over him and that plaintiff's KWPA claim fails to state a claim for relief.  As will be explained, Mr. Troia's motion to dismiss is granted in part and denied in part and the motion to transfer is denied.

*Background*

In July 2013, plaintiff Fred Fotouhi executed an employment contract under which he agreed to serve as the Chief Executive Officer of defendants Mobile RF Solutions, Inc. and Wireless Site Services, Inc.[1]  Defendant Brian Troia executed the agreement on behalf of the corporate defendants in his capacity as president and chairman of those entities.  The parties' written agreement provided that plaintiff would serve as CEO beginning August 1, 2013 for a five-year term ending August 1, 2018.  Plaintiff was employed at defendants' headquarters in Overland Park, Kansas and he is a Kansas resident.

Plaintiff's annual salary as set forth in the agreement was $180,000 and the agreement provided for additional incentives based on the financial performance of Mobile RF Solutions, Inc. and Wireless Site Solutions, Inc.  Specifically, paragraph 4 of the parties' agreement provided for a "bonus rate" of a certain percentage of sales depending on the company's net profit margin.  For example, if the company's net profit margin ranged from 10% to 15%, plaintiff was entitled to a bonus calculated as 1.5% of "sales across the board."  While paragraph 5 of the parties' agreement is less clear, it appears that plaintiff was either entitled to a certain percentage of ownership in the company or could exercise certain stock options and that potential ownership percentage increased as the company's gross revenues increased.  For example, the chart contained in the agreement reflects "CEO Ownership" of 3% if the company's gross revenues reached $10 million.  Paragraph 8 of the parties' agreement contains a provision concerning severance pay in the event of defendants' early termination of the agreement.  That provision provides as follows:

---

[1] Plaintiff alleges that the two corporate defendants operate as a single entity.

> The Company may cancel this Agreement for any reason, with or without cause, which need not be disclosed to CEO, by giving him thirty (30) days notice in writing, and then paying to CEO severance consisting of twelve (12) months salary plus one additional month salary for each year (or prorated portion thereof) of completed service to the Company, in addition to all accrued vacation or personal days, and any unused or prorated Professional Development Leave.

Mr. Troia terminated plaintiff's employment in September 2014.  In November 2014, plaintiff contacted Mr. Troia to request payment of his severance pay and to confirm the amount owed to him under the short- and long-term incentive provisions.  According to plaintiff, Mr. Troia refused to pay any and all amounts owed to plaintiff.

*Personal Jurisdiction*

In his motion to dismiss, Mr. Troia contends that his contacts with the forum state (he does not dispute that he had numerous contacts with Kansas, including multiple visits to Kansas) were made solely as an officer of Mobile RF Solutions, Inc. or Wireless Site Services, Inc. such that the fiduciary shield doctrine precludes this court from exercising personal jurisdiction over him.  Under the "fiduciary shield" doctrine, a nonresident corporate agent generally is not individually subject to a court's jurisdiction based on acts undertaken on behalf of the corporation." *Newsome v. Gallacher*, 722 F.3d 1257, 1275 (10th Cir. 2013).  Thus, even if a particular corporate employee has substantial contacts with the forum state—i.e., the employee repeatedly traveled to Kansas to negotiate a contract on behalf of the corporation—those contacts will not "count against the employee in the personal jurisdiction analysis so long as the employee acted solely on the corporation's behalf." *See id*.  As explained by the Circuit in Newsome, however, the fiduciary shield doctrine "only exists as a matter of state law." *Id*.

Thus, the threshold question is whether Kansas recognizes the fiduciary shield doctrine. This court has previously expressed doubt on the viability of the doctrine in Kansas. *See First Magnus Fin. Corp. v. Star Equity Funding, LLC*, 2007 WL 635312, at *6 n.3 (D. Kan. 2007) (because Kansas long-arm statute is coterminous with the full reach of the due process clause, and Constitution itself does not shield persons who act as corporate agents from individual capacity suits, court not persuaded that doctrine would apply). Mr. Troia does not cite, nor could the court locate any Kansas law recognizing the fiduciary shield doctrine. Certainly, the Kansas long-arm statute does not authorize the application of the fiduciary shield doctrine, as it permits the exercise of personal jurisdiction up to the limits of federal due process. *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc*., 205 F.3d 1244, 1247 (10th Cir. 2000); *Newsome*, 722 F.3d at 1278 (Oklahoma long-arm statute did not authorize fiduciary shield doctrine because statute permits exercise of jurisdiction up to the limits of federal due process). While Mr. Troia relies on several Kansas federal district court cases applying the fiduciary shield, those cases in turn rely upon *Ten Mile Industrial Park v. Western Plains Service Corp*., 810 F.2d 1518 (10th Cir. 1987) and *Wilshire Oil Company of Texas v. Riffe*, 409 F.2d 1277, 1281 n.8 (10th Cir. 1961) as authority for the doctrine in Kansas. But *Ten Mile* has been confined to the doctrine as applied in Wyoming, *see Newsome*, 722 F.3d at 1278, and *Wilshire Oil*, although purporting to apply the Kansas long-arm statute, relied exclusively on New York cases in its brief discussion of the doctrine. *Wilshire Oil*, then, does not establish the existence of the fiduciary shield doctrine as a matter of Kansas law. *See Newsome*, 722 F.3d at 1278.

Based on the foregoing, the court does not believe that Kansas courts, if faced with the issue, would graft the fiduciary shield doctrine into a long-arm statute intended to reach as far as

due process allows.  The fiduciary shield doctrine therefore does not provide a basis for Mr. Troia to avoid personal jurisdiction in Kansas.  Because Mr. Troia does not otherwise dispute the issue of personal jurisdiction, the court denies this aspect of his motion.

*Kansas Wage Payment Act*

Mr. Troia next moves to dismiss plaintiff's Kansas Wage Payment Act (KWPA) claim for failure to state a claim for relief.  The KWPA gives employees the right to receive their "wages due" and concerns when and how those wages are paid.  *See* K. S.A. § 44–314.  In those instances when an employer willfully fails to pay an employee his or her wages, the KWPA provides that the employer is liable for both the wages due and a penalty in an amount up to 100% of the unpaid wages.  *See id*. § 44–315(b).  The KWPA defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions." *Id*. § 44–313(c).  Kansas Administrative Regulations defines "or other basis" within the meaning of K.S.A. 44-§ 313(c) as:

> all agreed compensation for services for which the conditions required for entitlement, eligibility, accrual or earning have been met by the employee. Such compensation may include, but is not limited to, profit sharing, fringe benefits, or compensation due as a result of services performed under an employment contract that has a wage rate required or implied by state or federal law. Conditions subsequent to such entitlement, eligibility, accrual or earning resulting in a forfeiture or loss of such earned wage shall be ineffective and unenforceable.

K.A.R. § 49–20–1(d).

In his petition, Mr. Fotouhi asserts that the "wages" he is owed under the KWPA consist of his unpaid severance and the unpaid short- and long-term incentive bonuses as detailed in the

parties' employment agreement.   As noted earlier, the agreement's severance pay provision states as follows:

> The Company may cancel this Agreement for any reason, with or without cause, which need not be disclosed to CEO, by giving him thirty (30) days notice in writing, and then paying to CEO severance consisting of twelve (12) months salary plus one additional month salary for each year (or prorated portion thereof) of completed service to the Company, in addition to all accrued vacation or personal days, and any unused or prorated Professional Development Leave.

Agreement ¶ 8(c).   The agreement further provides for "short-term performance" bonuses measured by the corporation's net profit margins and for long-term incentives (consisting of restricted stock ownership) tied to the corporation's gross revenues.   Agreement ¶¶ 4, 5.   In support of his motion to dismiss, Mr. Troia contends that he is not an "employer" for purposes of the KWPA and, in any event, the unpaid severance cannot be deemed "wages" under the KWPA.   Mr. Troia, apparently by oversight, does not address the short- or long-term incentive plans in his motion.

As a threshold matter, the court rejects Mr. Troia's argument that he is not an "employer" for purposes of the KWPA.   As alleged in plaintiff's petition, Mr. Troia, as the president and chairman of both Mobile RF Solutions, Inc. and Wireless Site Solutions, Inc., was the person solely responsible for all decisions regarding the payment of plaintiff's wages and Mr. Troia is the person who refused to pay plaintiff the wages due to him.   If these allegations are proved, the KWPA provides for Mr. Troia's liability:

> Any officer, manager, major shareholder or other person who has charge of the affairs of an employer, and who knowingly permits the employer to engage in violations of K.S.A. 44-314 or 44-315, and amendments thereto, may be deemed the employer for purposes of this act.

*See* K.S.A. § 44-323(b).  Because the KWPA expressly provides for corporate officer liability when the officer aids a corporation in violating the provisions requiring payment of earned wages to employees, the court necessarily rejects at this juncture Mr. Troia's argument.  *See State ex rel. McCain v. Erdman*, 4 Kan. App. 2d 375, 377 (1980) (sole officer of a corporation liable for corporation's violation of KWPA).[2]

The court turns, then, to the issue of whether the severance pay contemplated in the agreement constitutes "wages" under the KWPA.  To date, Kansas courts have not directly addressed the issue of whether or in what circumstances severance pay constitutes "wages" for purposes of the KWPA.  In *Commodore v. Armour & Co.*, 441 P.2d 815, 201 Kan. 412 (1968), the court was faced with a determination of whether an assignment of separation pay was tantamount to an assignment of future wages for purposes of the general rule that wages earned after a bankruptcy adjudication become the property of the bankrupt clear of the claims of all creditors.  *See id.* at 418–419.  The court ultimately concluded that the plaintiff's separation pay constituted wages under the terms of the applicable collective bargaining agreement.  *See id.* at 420–21.  According to plaintiff, *Commodore* supports the same conclusion here.

*Commodore*, however, is distinguishable in several important respects. First, the court in *Commodore* was not addressing the meaning of the terms "wages" as used in the KWPA and no statutory scheme was at issue in that case.  Second, the severance pay provision in *Commodore* was contained in a collective bargaining agreement and the court noted in its analysis that "separation pay is generally considered wages when provided for by collective bargaining

---

[2] Mr. Troia contends that, despite the language of K.S.A. § 44-323(b), plaintiff's KWPA claim should be dismissed against him because the petition does not allege that Mr. Troia knowingly permitted a violation of the KWPA.  It plainly does.

agreements." *Id.* at 420.   But most importantly, the collective bargaining agreement in *Commodore* expressly defined separation pay as "earned during periods of employment with the Company," and it was calculated based upon an employee's wage history and length of employment such that the longer an employee worked for the Company, the higher that employee's severance allowance climbed.  *Id.* at 417, 420.  As explained by the court:

> Under the terms of the agreement in question, plaintiff's continuing, in a satisfactory manner, his services in Armour's employment was an important part of the consideration for separation pay.  He was paid weekly wages for his ordinary services. Separation pay constituted additional wages for continuing in employment until termination . . .   Entitlement to separation pay required substantial services by way of continued employment and termination thereof under the required conditions on the part of plaintiff subsequent to his adjudication in bankruptcy.

*Id.* at 421.

By contrast, the parties' agreement here provides for a lump-sum payment equivalent to twelve months' salary (specifically, $180,000) to plaintiff if his employment is involuntarily terminated at any time prior to the end of the five-year contract period. Unlike *Commodore*, then, this aspect of plaintiff's severance agreement is in no way tied to his continued employment.  Indeed, if he remained employed after the end of the five-year contract period, he was entitled to no severance at all under the agreement (but was entitled to a longevity bonus) and, conversely, he was entitled to the lump-sum payment if his employment was involuntarily terminated just one day into his employment.  In that regard, plaintiff's entitlement to severance pay did not require any services on the part of plaintiff.  Clearly, then, plaintiff was not "earning" this lump-sum payment over the course of his employment as in *Commodore*.

This court, in analyzing analogous factual circumstances, has previously expressed its belief that the Kansas Supreme Court would conclude that a lump-sum severance payment similar to the payment in this case would not constitute "compensation for labor or services rendered" within the meaning of the KWPA. *See Firestone v. Hawker Beechcraft Int'l Service Co.*, 2012 WL 683286, at *17 (D. Kan. 2012). In that case, the pertinent employment agreement provided for a lump-sum payment of $650,000 if the employee was terminated for any reason prior to a fixed date. *Id.* at *16. After reviewing cases in jurisdictions with wage payment statutes utilizing language that mirrors the language used in the KWPA, this court explained:

> The payment is not tied to plaintiff's continued employment in any way; he did not earn the severance pay over the course of his employment; and he owed no services in exchange for the severance pay. In such circumstances, the court will not read the term "wages" so broadly to include the severance pay at issue here within the narrow definition of wages under the KWPA.

*Id.* at *17 (granting summary judgment on plaintiff's KWPA claim).[3] Plaintiff has not distinguished or discussed this court's decision in *Firestone* and the court, having revisited the case, sees no reason to depart from that analysis.

The parties' severance provision also provides for the payment of additional severance equal to one month's salary for each additional year of service to the company on a prorated basis. While this aspect of the severance provision is arguably linked to plaintiff's service in the limited sense that plaintiff's severance payment increased for each additional year of service, the court nonetheless believes that the Kansas Supreme Court would hold that these payments are

---

[3] In *Firestone*, this court noted that Connecticut, Nebraska and Indiana have Wage Payment statutes in which the definition of "wages" mirrors the definition of "wages" in the KWPA. 2012 WL 683286, at *17.

not "wages" for purposes of the KWPA.  In other contexts, Kansas courts have defined severance payments in such a way that such payments would not be considered "wages" within the meaning of the KWPA.  *See In re Marriage of Branch*, 152 P.3d 1265, 1268-69 (Kan. App. 2007) (severance payment based on wages and years of service is "compensation . . . for the layoff" and is a substitute for lost wages); *A.O. Smith Corp. v. Kansas Dep't of Human Resources*, 144 P.3d 760, 765-66 (Kan. App. 2005) (severance pay serves "a distinctly different function" than wages; severance protects employees from economic hardship and rewards employees for past service).  Consistent with these cases, the severance payment under the parties' agreement is more properly construed as a substitute for lost wages or compensation for the economic hardship and uncertainty that comes with unexpected unemployment.  Because plaintiff was only entitled to the payment upon termination, it cannot be deemed as compensation for services rendered—and, of course, plaintiff was already receiving his regular salary and benefits in exchange for his services.  *See Eilmeier v. City of Omaha*, 783 N.W.2d 795, 798-99 (Neb. 2010) (although severance payments provided incentive to keep working, payments still could not be considered wages under state wage payment act because payments were made only upon termination) (construing language identical to KWPA).  For the foregoing reasons, the court grants Mr. Troia's motion to dismiss plaintiff's KWPA claim to the extent that claim asserts damages based on any unpaid severance pay.

The issue of whether the stock option plan and profit-sharing plan set forth in the parties' agreement constitutes "wages" under the KWPA is not properly before the court at this juncture and the court will not resolve the issue at this time.  As noted earlier, Mr. Troia did not raise the incentive pay aspects of plaintiff's KWPA claim in his motion to dismiss.  Nonetheless, for the

parties' consideration, the court notes that the Tenth Circuit has opined in one case that stock options do not constitute "wages" under the KWPA when the right to the stock options was not absolute but required the employee to exercise the option and when the option, by agreement, expired upon an employee's termination for cause.  *Weir v. Anaconda Co.*, 773 F.2d 1073, 1083-85 (10th Cir. 1985).  Thus, because the stock option plan contained a valid condition precedent that the employee did not meet (exercising the option when eligible to do so), the Circuit held that the district court properly held that the stock options were not wages under the KWPA.  *Id.* at 1086; *see also Paolini v. Albertson's, Inc.*, 149 P.3d 822 (2006) (non-monetary compensation such as stock options cannot be wages because that form of compensation is not payable in cash, with a check, or by deposit into the employee's account) (wage payment statute analogous to KWPA).  Depending on the particular facts of this case, the *Weir* decision may be helpful to the parties in future discussions of this issue.

With respect to profit-sharing plans, the Kansas Court of Appeals has held that profit-sharing under a plan requiring an employee to be on the payroll on the distribution dates in order to receive profit sharing could not be considered "wages" under the KWPA because the parties' agreement contained a valid condition precedent to an employee's entitlement to such payment and the employee had not fulfilled that condition.  *Morton Bldgs., Inc. v. Department of Human Resources*, 695 P.2d 450, 453-54 (Kan. App. 1985).  *Morton*, however, suggests that profit-sharing plans might well constitute "wages" so long as the employee fulfilled any condition precedents or if the parties' agreement did not contain any condition precedents.  That approach comports with other cases from jurisdictions with wage payment statutes that mirror the KWPA.

The Connecticut Supreme Court, for example, has determined that nondiscretionary profit-sharing bonuses calculated in accordance with a precise formula detailed in the employment agreement constitute "wages" for purposes of Connecticut's wage payment act. *See Association Resources, Inc. v. Wall*, 2 A.3d 873, 893-95 (Conn. 2010).  In that case, the Connecticut Supreme Court analyzed an employment agreement under which the defendant was contractually bound to pay the bonus to the plaintiff and the amount of the bonus was expressly derived from the company's net profitability.  *Id*. at 895.  In concluding that the promised bonus was part of the employee's "wages" for purposes of the Wage Payment act, the court rejected the defendant's argument that the bonus was not linked to the particular employee's performance or efforts and was based instead on the productivity of the corporation as a whole. Id. As explained by the court:

> [The defendant's argument] does not recognize the nature of the plaintiff's employment as a senior level, executive manager of one of the defendant's divisions, with the bonus tied directly to the success of that specific division, rather than the performance of the defendant as a whole. . . . Put differently, to conclude that the bonus is not a wage because not every dollar earned by the Digital Group was directly attributable to the plaintiff's labors would be to ignore the realities of his executive-level managerial position, which was to be directly and solely responsible for the profitability of that division.

*Id*. at 895-96.  Similarly, the Nebraska Supreme Court has held that an employee is entitled to recover as "wages" a bonus under an incentive compensation plan that promised a bonus if the defendant-company reached a certain profit level for the fiscal year.  *Knutson v. Snyder Indus., Inc*., 436 N.W.2d 496, 498 (Neb. 1989).  Finding that the purpose of the incentive plan was to increase productivity rather than to retain long-term employees, the court held that employment on the date of disbursement of the bonus was not an implied term of the bonus agreement and

that the plaintiff was entitled to the bonus under the Wage Payment act where she was employed at the end of the fiscal year.  *Id.*

Other courts, however, have held that profit-sharing bonuses do not constitute wages for more practical reasons—a bonus payment "tied to results of the employer's overall operations is not consistent with the time constraints imposed" by most wage payment statutes.  *See Herremans v. Carrera Designs, Inc*., 157 F.3d 1118, 1121-22 (7th Cir. 1998).  As explained by the Seventh Circuit:

> The fact, moreover, that his entitlement was to a share of annual profits counts heavily against his statutory claim, in view of the statutory requirement that wages be paid within 10 days of their accrual. Ordinarily it would take weeks to determine a plant's profits for the year just ended. To impose punitive damages on the employer for failing to pay an amount of compensation that could not be computed in time to avoid the penalty would be absurd.

*Id*. at 1121-22.  The Circuit also rejected the wage claims on the grounds that "profits" cannot be construed as wages so neither could a fraction of profits be construed as wages.  *Id*. at 1121 ("a bonus that is based on the performance of a plant rather than on the time or determinable output of the employee is not wages); *accord Highhouse v. Midwest Orthopedic Institute, P.C*., 807 N.E.2d 737 (Ind. 2004) (bonus linked to a contingency such as financial success of company is not a wage, and finding otherwise would be inconsistent with time restraints contained in wage payment act).

To the extent Mr. Troia challenges plaintiff's KWPA claim at some future time, the parties should consider how these cases might apply to the particular agreement executed by the parties in this case.

13

*Transfer Under 28 U.S.C. § 1404*

In the alternative, Mr. Troia moves to transfer this case to the United States District Court for the District of Nebraska under 28 U.S.C. § 1404.  Under that statute, a district court may transfer an action "[f]or the convenience of parties and witnesses, [and] in the interest of justice . . . . to any other district or division where it might have been brought."  In considering a motion to transfer under § 1404(a), the court weighs the following discretionary factors:

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010) (quoting *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991)).  The "party moving to transfer a case pursuant to § 1404(a) bears the burden of establishing that the existing forum is inconvenient." *Id.* (quoting *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992)).  "Merely shifting the inconvenience from one side to the other, however, obviously is not a permissible justification for a change of venue." *Id.* (quoting *Scheidt*, 956 F.2d at 966).

As a resident of the forum state, plaintiff's choice of forum generally may not be disturbed by the court unless "the balance is strongly in favor of the movant." *Id.*  Mr. Troia has not satisfied his burden of showing that the present forum is so inconvenient that the balance "strongly" weighs in his favor.  While Mr. Troia highlights that plaintiff executed his employment agreement in Nebraska, that fact is insufficient to tip the scales in favor of Mr.

Troia when the record reflects that plaintiff's performance under the contract occurred in Kansas. *Id*. at 1168 (fact that contract was executed in Utah did not warrant transfer of action to Utah where denial of coverage occurred in Colorado and the alleged loss occurred in forum state of Wyoming). Moreover, while Mr. Troia vaguely asserts that there are not a significant number of witnesses in Kansas, he does not identify any potential witnesses or their locations; does not identify the materiality of their testimony; and has not asserted that any witness would be unwilling to come to Kansas for trial. Indeed, the record currently reflects only two witnesses— plaintiff and Mr. Troia. This factor, then, weighs against transfer. *Id*. at 1169 (accessibility of witnesses weighed against transfer where movant did not identify witnesses with specificity and did not indicate subject matter of testimony).

Mr. Troia does not address any other considerations pertinent to the transfer question. He asserts that Mr. Troia "cannot complain" about litigating in Nebraska because he knowingly executed a contract in Nebraska with a Nebraska corporation, but whether plaintiff would be entitled to complain about litigating in Nebraska is simply not relevant in considering a motion to transfer under § 1404(a). In short, Mr. Troia has not established that Kansas is an inconvenient forum and, at most, he seeks to shift his own inconvenience to plaintiff. The motion is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Brian Troia's motion to dismiss or, in the alternative, to transfer (doc. 23) is granted in part and denied in part.

**IT IS SO ORDERED.**

15

Dated this 26th day of May, 2015, at Kansas City, Kansas.


                                        s/ John W. Lungstrum
                                        John W. Lungstrum
                                        United States District Judge